Douglas MYERS, Appellant,

v.

**MUNICIPALITY OF ANCHORAGE,**
Appellee.

No. A–8739.

Court of Appeals of Alaska.

April 7, 2006.

Rebecca J. Hozubin, Wilkerson, Hozubin, & Burke, for the Appellant.

John E. McConnaughy III, Assistant Municipal Prosecutor, and Frederick H. Boness, Municipal Attorney, Anchorage, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

This appeal involves a constitutional attack on the Municipality of Anchorage's "drug

paraphernalia" ordinances—a trio of laws that, read together, prohibit the possession and sale of items connected with the manufacturing, dispensing, storing, and use of controlled substances.

The parties to this appeal describe the main issue as whether these ordinances are too "vague". Vagueness is, indeed, one of the problems with these laws. As we discuss in detail below, the definition of "drug paraphernalia" codified in AMC 08.35.010 can not easily be understood or applied. But there is another major problem with the ordinances: under the ordinances, people may be convicted of a crime without any proof that they acted with a culpable mental state.

There is yet another problem with the drug paraphernalia ordinances: as written, these ordinances outlaw the sale or possession of any item connected with the manufacture, dispensing, storage, or use of controlled substances—regardless of whether that manufacture, dispensing, storage, or use is lawful or unlawful. On their face, the ordinances prohibit conduct that drug manufacturers, pharmacists, doctors, and patients must necessarily engage in when they lawfully manufacture, store, prepare, dispense, and use controlled substances.

As we explain below, this third problem appears to be a drafting error. If this third problem were the only flaw in the ordinances, we would probably resolve this case by adopting a limiting construction of the ordinances. But we can not solve the other two problems: the fact that the definition of the prohibited conduct is so vague that it can not be understood or applied, and the fact that the ordinances authorize criminal convictions without proof of a culpable mental state.

For these reasons, we conclude that the Municipality's drug paraphernalia ordinances are flawed beyond judicial salvage, and that they must be declared unconstitutional.

*Overview of the Municipality of Anchorage's drug paraphernalia ordinances*

As mentioned above, this case involves a trio of ordinances found in the Anchorage Municipal Code.

Section 08.35.010 defines the term "drug paraphernalia".

Section 08.35.020 prohibits the sale of drug paraphernalia or the possession of drug paraphernalia with intent to sell, "except as specifically authorized and permitted" by Title 17 of the Alaska Statutes or by state regulations adopted under the authority of Title 17.

Section 08.35.025 prohibits the possession of drug paraphernalia in public (even if the possessor has no intent to sell it, and "regardless of whether the item . . . is publicly displayed").

To understand the issues presented in this case, one must study the definition of "drug paraphernalia" codified in section 08.35.010. One difficulty in discussing section 08.35.010 is that its definition of "drug paraphernalia" is divided into two distinct parts—two discrete definitional paragraphs—and neither of these definitional paragraphs is designated with a number or letter. Moreover, each of these two definitional paragraphs is followed by a numbered list, and both lists begin with "1".

To make it easier for readers to follow our discussion of this ordinance, we will refer to the two definitional paragraphs as "Paragraph A" and "Paragraph B".

Paragraph A of the ordinance declares that "drug paraphernalia" means:

any items [*sic:* "item"] whose objective characteristics or objective manufacturer's design indicate that it is intended for use in the consumption, ingestion, inhalation, injection or other method of introduction of a controlled substance into the human body or to facilitate a violation of AS 11.71.

(Under the Anchorage Municipal Code, a "controlled substance" is any substance listed in any of the six schedules codified in AS 11.71.140–190. *See* AMC 08.35.010(A).)

Because the definition of drug paraphernalia codified in Paragraph A hinges on an item's "objective" characteristics or design, we will refer to this portion of the definition as the "objective characteristics" test.

Paragraph B of the ordinance supplements the objective characteristics test codified in Paragraph A. Paragraph B declares

that, in addition to all of the items covered by Paragraph A, "drug paraphernalia" *also* means:

> any item where circumstances reasonably indicate that the subjective intent of [its] possessor is to use it or sell it for the consumption, ingestion, inhalation, injection or other method of introduction of a controlled substance into the human body or to facilitate a violation of AS 11.71.

Because the definition of drug paraphernalia codified in Paragraph B hinges on whether the circumstances furnish a reasonable indication of the possessor's intent, we will refer to this portion of the definition as the "reasonable indication of intent" test.

*As written, the two definitions of "drug paraphernalia" in AMC 08.35.010 (Paragraphs A and B) cover any item connected with the preparation, distribution, storage, or use of a controlled substance—regardless of whether the use of the controlled substance is legal or illegal*

Both Paragraph A and Paragraph B of the ordinance declare that an item is "drug paraphernalia" if it is intended for *either* of two purposes: (1) to aid the introduction of a controlled substance into a human body, *or* (2) to facilitate a violation of our state's Controlled Substances Act, AS 11.71.

The problem here is that the "introduction of controlled substances into a human body" is not illegal *per se*. Every day in this state, thousands of people lawfully prepare, dispense, store, and use controlled substances. The introduction of a controlled substance into a person's body is unlawful only if the controlled substance has not been prescribed for a medical purpose—that is, only if the use of the controlled substance violates our state's Controlled Substances Act, AS 11.71.[1]

But the *second* clause of Paragraphs A and B already covers all items intended to facilitate violations of AS 11.71. Thus, using normal rules of statutory construction—in particular, the rule that a statute should not be construed so as to make any of its provisions superfluous [2]—we would be led to conclude that the first clause of Paragraphs A and B was intended to apply to instances where the introduction of a controlled substance into a person's body *does not* violate the Controlled Substances Act—that is, instances where the person's use of the controlled substance is lawful.

At first blush, one might think that this flaw is cured by a certain provision of AMC 08.35.020, the ordinance that prohibits the sale of drug paraphernalia or the possession of drug paraphernalia with intent to sell. This ordinance declares that it is a crime to sell drug paraphernalia, or to possess drug paraphernalia with intent to sell it, "except as specifically authorized and permitted under the provisions of AS 17 and by such rules and regulations as are adopted there[under]".

One might assume (indeed, we made this assumption when we first read this ordinance) that the language quoted in the last sentence refers to specific statutes in Title 17, or to specific state regulations, that authorize the sale and possession of drug paraphernalia in connection with the lawful manufacture, dispensing, and use of controlled substances. But this assumption would be wrong.

With the exception of the statutes governing the medical use of marijuana (AS 17.37.010–080), Title 17 of the Alaska Statutes contains no provision that specifically authorizes the sale or possession of drug paraphernalia for any purpose. Nor does the Alaska Administrative Code contain any

---

1. Each provision of AS 11.71 that prohibits the manufacture, delivery, or possession of controlled substances (AS 11.71.010–060) begins with the phrase, "Except as authorized in AS 17.30". The pertinent provisions of AS 17.30 (AS 17.30.020–080) declare that preparing, distributing, storing, and conducting research with controlled substances is lawful if it is done in conformity with federal registration requirements or by prescription for a medical purpose.

2. *See Mechanical Contractors of Alaska, Inc. v. Department of Public Safety,* 91 P.3d 240, 248 (Alaska 2004) ("When we engage in statutory construction[,] we will presume that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous."); *Ault v. State,* 73 P.3d 1248, 1251 n. 18 (Alaska App.2003).

regulation promulgated under Title 17 that specifically authorizes the sale or possession of drug paraphernalia.

Thus, although AMC 08.35.020 contains a clause that purports to allow the sale or possession of drug paraphernalia when that sale or possession is "specifically authorized and permitted" by state law, this clause is essentially a nullity.

This brings us back to our initial reading of the drug paraphernalia ordinance: the second clause of Paragraphs A and B covers all items that are intended to facilitate the *unlawful* use of controlled substances (any use that violates AS 11.71), while the first clause of Paragraphs A and B covers all items that are intended to facilitate the *lawful* use of controlled substances.

The legislative history of the Municipality's drug paraphernalia ordinances suggests that this problem arises from a drafting error committed twenty-five years ago—and that the language of Paragraphs A and B of the ordinance fails to reflect the intention of the Municipal Attorney's Office (which drafted the ordinance) and the Municipal Assembly (which adopted the ordinance).

The pertinent legislative history begins with the minutes of the Municipal Assembly's meeting of January 1982. At this meeting, the Assembly debated whether to enact Anchorage's predecessor drug paraphernalia ordinance. From the minutes of this discussion, it appears that the Assembly was thinking only of the unlawful use of controlled substances, and that the Assembly did not intend to outlaw the possession or sale of items connected with the lawful use of controlled substances.

The predecessor ordinance defined "drug paraphernalia" as any item intended for use in "introducing into a human body a controlled substance".[3] This language suffered from the same flaw as the current definition: it outlawed all items connected with the law-

ful use of controlled substances as well as items connected with the unlawful use of controlled substances.

At its January 1982 meeting, the Anchorage Assembly heard comments from various members of the public, including a representative of the American Diabetes Association, expressing concern that the proposed ordinance would impose penalties on lawful users of controlled substances. In response, the municipal attorney told the Assembly that the proposed ordinance "prohibit[ed] the sale of drug paraphernalia [only] if the seller knows [that the item] is to be used to ingest illicit drugs".[4]

Strictly speaking, there are no "illicit drugs", but only illicit uses of drugs. The municipal attorney assumedly meant that the ordinance was intended to apply only to items connected with the unlawful use of controlled substances. This interpretation is confirmed by the fact that the municipal attorney also told the Assembly that the proposed ordinance would have no effect on diabetics or other people who carried syringes or other items connected with the lawful ingestion of controlled substances.[5]

Thus, even though the 1982 version of the drug paraphernalia ordinance, as written, outlawed all items connected with *any* use—even lawful uses—of controlled substances, it appears that the Municipal Assembly voted for this ordinance only after being assured that the ordinance applied only to items connected with the *unlawful* use of controlled substances.

■ Alaska does not follow the "plain meaning" rule of statutory interpretation—the rule that bars a court from considering legislative history as an interpretive aid if a statute's meaning is facially "plain".[6] Accordingly, we are authorized to rely upon the legislative history from 1982 to narrow the scope of the drug paraphernalia ordinance even though, as written, the ordinance plain-

---

**3.** Anchorage Ordinance 81–219, Section 2, proposed AMC 08.20.010(B).

**4.** Minutes of the Anchorage Assembly, January 12, 1982: discussion of Anchorage Ordinance 81–219.

**5.** *Id.*

**6.** *University of Alaska v. Tumeo,* 933 P.2d 1147, 1152 (Alaska 1997); *Lagos v. City and Borough of Sitka,* 823 P.2d 641, 643 (Alaska 1991); *Gilley v. State,* 955 P.2d 927, 930 (Alaska App.1998).

ly covers all items connected with *any* use—even lawful uses—of controlled substances.

The situation is, however, made more complicated by the Municipal Assembly's enactment of amended drug paraphernalia ordinances in 2000.

The Anchorage drug paraphernalia ordinances were substantially re-written in 2000.[7] It was during this revision that the definition of drug paraphernalia assumed its current form—covering all items intended for either of two purposes: (1) to aid the introduction of a controlled substance into a human body, or (2) to facilitate a violation of our state's Controlled Substances Act, AS 11.71.

Under normal circumstances, this change in the wording of the ordinance would be a strong indication that the ordinance was, in fact, intended to cover items connected with *any* use of controlled substances, whether that use was lawful or unlawful.

The ordinance now outlaws all items that are intended either (1) to aid the introduction of a controlled substance into a human body, or (2) to facilitate a violation of the state's drug laws. The rules of statutory construction direct us to interpret the first clause of this definition as *supplementing* the second clause, not simply restating it. Since clause (2) covers all items connected with the *unlawful* use of controlled substances, clause (1) must cover all items connected with *any other* use of controlled substances—in other words, lawful uses.

The legislative history of this 2000 re-writing of the ordinance is essentially silent on this point. Even though the Municipal Attorney's Office was proposing an extensive revision of the Anchorage drug paraphernalia ordinances, the supporting memorandum prepared by the municipal attorney devoted only two sentences to the proposed amendment, and only one of those sentences is pertinent to the issue we are discussing. That one sentence declared that the drug paraphernalia ordinances were being amended "[to] reflect decisions on the constitutionality of similar ordinances by the United States Supreme Court." The memorandum

did not specify what court decisions the municipal attorney was referring to.

The minutes from the Anchorage Assembly meeting of July 2000 reflect that no one appeared before the Assembly to offer public comment on the proposed revision.[8] The minutes do reflect that an attorney from the Municipal Attorney's Office responded to Assembly questions regarding "definitions, the difference between subjective and objective standards of state and municipal laws, and . . . [the] outcomes of [court] cases in other states".

We assume, from the context, that at least some of the assistant municipal attorney's remarks were aimed at clarifying the proposed revision of the drug paraphernalia ordinances. The minutes do not, however, give any details of the Assembly's questions or the attorney's responses.

(We note, moreover, that it is possible that the assistant municipal attorney was addressing other aspects of the proposed ordinance—because this same ordinance also proposed amendments to several other unrelated sections of the Municipal Code. In particular, Anchorage Ordinance 2000–95 also amended the sections of the Code relating to child abuse, the illegal use of computers and e-mail, resisting or interfering with a police officer, and the identification of criminal offenses that stem from acts of domestic violence.)

Given this history (or, rather, lack of history) from 2000, it appears that the Anchorage Assembly did not give any particular thought to the revised definition of "drug paraphernalia" that it adopted in 2000. As a result of the Assembly's action, both Paragraph A and Paragraph B of the ordinance now define "drug paraphernalia" as any item connected with

> the consumption, ingestion, inhalation, injection or other method of introduction of a controlled substance into the human body or to facilitate a violation of AS 11.71.

This revised wording—that is, the wording of the current ordinance that governs this

---

7. Anchorage Ordinance 2000–95.

case—clearly covers all items that facilitate *any* use of controlled substances, whether that use is lawful or unlawful.

Nevertheless, in light of the municipal attorney's explanation of the intended meaning of the corresponding language from the predecessor ordinance of 1982, and in light of the scant attention paid to the new definitional language that appeared in the re-written ordinance in 2000, it appears that the Assembly may still have been relying on the municipal attorney's assurance (from January 1982) that the drug paraphernalia ordinances would apply only to items connected with the *unlawful* use of controlled substances. Moreover, if we interpreted the drug paraphernalia ordinance in accordance with its language, this would lead to results that, without a doubt, the Anchorage Municipal Assembly would never have approved.

■ Under such circumstances, we are not bound by the wording of the ordinance. As our supreme court explained in *Federal Deposit Insurance Corp. v. Laidlaw Transit, Inc.*:

> [E]ven when a statute's language [and] meaning seems plain on its face, ambiguity may arise if applying that meaning would yield anomalous consequences.... Thus, [even] courts adhering to the "plain meaning" rule of statutory interpretation commonly define the rule to apply only [when both the] language of a statute is clear and construction [of the statute] according to its terms does not lead to absurd consequences.

21 P.3d 344, 351 & n. 27 (Alaska 2001) (citations and internal quotes omitted).

For these reasons, we might conceivably cure the problem in Paragraphs A and B of the ordinance by striking the words "or to facilitate a", and then replacing those words with a single word, "in". After this change, the definitions in Paragraph A and Paragraph B would apply only to items connected with "the consumption, ingestion, inhalation, injection or other method of introduction of a controlled substance into the human body in violation of AS 11.71"—in other words, items connected with a violation of the controlled substances chapter of Alaska's criminal code.

■ But as we explain in the remainder of this opinion, even if we adopted this narrowing construction of Paragraphs A and B, each of these definitional paragraphs would still suffer from an intractable constitutional problem.

*The definition of "drug paraphernalia"— Paragraph A: the "objective characteristics" test*

As we mentioned above, each of the two definitional paragraphs in AMC 08.35.010 is followed by a numbered list. In the case of Paragraph A, the list is introduced by the following words: "Drug paraphernalia [as defined in Paragraph A] includes but is not limited to ...". The ordinance then lists twelve categories of items that are declared to be "drug paraphernalia".

Among the twelve listed categories of drug paraphernalia, we see items that are commonly sold at groceries, greenhouses, and hardware stores—for example, "[any kit] used or intended for use in planting, propagating, cultivating, growing, or harvesting ... any species of plant which [either] is a controlled substance or from which a controlled substance can be derived" (Item A.1). We also see items that are found in any pharmacy—for example, "[any kit] used or intended for use in manufacturing, compounding, converting, producing, processing, or preparing controlled substances" (Item A.2).

We see items that are sold at department stores and cookware stores—for example, "[s]cales and balances used or intended for use in weighing or measuring controlled substances" (Item A.5), as well as "[b]lenders, bowls, containers, spoons, and mixing devices used or intended for use in compounding controlled substances" (Item A.8).

We see items that can be found in stationery stores—"envelopes" (Item A.9), and items that can be found in party supply stores—"balloons" (Item A.9).

We see items that can be found in the residences of people who rely on certain forms of daily medication—"hypodermic syringes, needles, and other objects used or

intended for use in parenterally [9] injecting controlled substances into the body" (Item A.11). We see items that can be found in tobacco shops—"wooden, . . . plastic, or ceramic pipes" (Item A.12.a), and in the homes of people who come from the Middle East or who have visited that region—"[w]ater pipes" (Item A.12.b).

Finally, we see items that could be found almost anywhere: "[c]ontainers and other objects used or intended for use in storing . . . controlled substances". (Item A.10)

Admittedly, this list of categories is preceded by the "objective characteristics" language in Paragraph A. For this reason, it would make sense to interpret these twelve listed categories of items as if each category were implicitly limited by the "objective characteristics" test. Thus, even though an item might be included among the twelve listed categories, the item would qualify as "drug paraphernalia" only if its *objective characteristics* showed that it was intended for some use connected with the unlawful introduction of a controlled substance into a human body.

But, as District Court Judge Gregory J. Motyka discovered when he tried to apply the "objective characteristics" test during an earlier stage of this case, it is often all but impossible to determine whether an item's "objective" characteristics show that it is intended for a use connected with the unlawful introduction of controlled substances into a human body.

For instance, what objective characteristic of a scale or a spoon shows that it is intended for the weighing or measuring of controlled substances instead of other things? Or what objective characteristic of a pipe (of normal size and construction) shows that it is intended for the smoking of marijuana as opposed to tobacco or other herbs? Does the characterization of these items as "drug paraphernalia" hinge on the type of decoration found on them? Would an illustration of a marijuana leaf render the scales or the pipe "drug paraphernalia"? What about a paisley pattern or other brightly colored design?

The task becomes even harder when we consider such listed items as "syringes", "balloons", and "bowls". What "objective characteristics" of a syringe would lead to the conclusion that it was intended for use in the unlawful injection of controlled substances, as opposed to the lawful injection of controlled substances prescribed as medicines? What "objective characteristics" of a balloon would lead to the conclusion that it was intended to be used for the unlawful transporting or storing of controlled substances as opposed to being used as a party decoration? What objective characteristics of a bowl would lead to the conclusion that it is intended for use in sifting marijuana as opposed to flour, or what objective characteristics of a mortar would indicate that it was intended for the grinding of controlled substances as opposed to spices?

Hardest of all is Item A.10, "containers". What objective characteristics of a box, a plastic storage container, a bottle, or a spice jar would lead to the conclusion that it was intended for the storage of controlled substances as opposed to other things? Moreover, pill bottles and pill dispensers are "containers" that are commonly used by pharmacists, doctors, and patients in connection with the lawful use of controlled substances—*i.e.*, the use of controlled substances by prescription. What objective characteristics of such an item would lead to the conclusion that it was intended for the storage of controlled substances that are to be ingested unlawfully, as opposed to the storage of lawful medicines?

The text of the Anchorage drug paraphernalia ordinance does not supply the answers to these questions.

A potential way to solve this statutory problem is suggested by the United States Supreme Court's decision in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

---

**9.** The "parenteral" introduction of a substance into the human body refers to introducing the substance in a manner other than through the gastro-intestinal tract. *Webster's New World College Dictionary* (Fourth Edition, 2004), p. 1047.

In *Hoffman Estates*, the United States Supreme Court addressed a constitutional challenge to a city ordinance that prohibited the sale of any item "designed or marketed for use with illegal ... drugs".[10] The Supreme Court dealt with the potential vagueness of this definition in two ways. First, the Court limited the "designed for use" clause by interpreting it to cover only items which, "by virtue of [their] objective features, *i.e.* features designed by [their] manufacturer", are "principally used with illegal drugs".[11] Second, the Court limited the "marketed for use" clause by interpreting it to require proof that the defendant intentionally displayed the item "in a manner that appeal[ed] to or encourag[ed] illegal drug use".[12] In other words, the government had to prove that the defendant "intend[ed] that [illegal] use" of the item.[13]

The Supreme Court acknowledged that, even after the ordinance was limited in this fashion, the ordinance still posed a significant risk of discriminatory enforcement. The Court noted that the record of the lower court proceedings "revealed confusion" concerning the scope of items covered by the ordinance.[14] The Court further noted that, according to the record, city officials relied extensively "on the 'judgment' of [individual] police officers to give meaning to the ordinance and to enforce it fairly".[15]

The Supreme Court emphasized that it was *not* deciding whether these potential flaws might bar enforcement of the ordinance in the future. Rather, the Court was deciding only that these problems did not render the ordinance *facially* unconstitutional, once the ordinance was limited in the fashion described in its opinion.[16]

The Supreme Court's decision in *Hoffman Estates* suggests a potential narrowing—and saving—interpretation of the definition of "drug paraphernalia" codified in Paragraph A of AMC 08.35.010. We could construe the "objective characteristics" test in Paragraph A as covering only those items which, judged by their objective characteristics, have but one principal use: the consumption, ingestion, inhalation, injection or other method of introduction of a controlled substance into the human body in violation of AS 11.71.

This narrowing construction would not answer all of the potential constitutional objections to this ordinance. For example, even construed in this fashion, the ordinance would still seemingly forbid a museum curator from assembling an exhibit of certain artifacts from the 1960s.

But more importantly, as we pointed out above, many people—*e.g.*, drug company representatives, pharmacists, doctors, and patients—routinely sell and possess objects which are specifically designed for use in the preparation, distribution, storage, and personal use of controlled substances. It is often very difficult, if not impossible, to identify any "objective characteristics" of these items that would reveal whether the item is primarily connected with the *unlawful* use of controlled substances as opposed to the lawful use of controlled substances.

For this reason, we might further interpret the ordinance to require proof that the seller or possessor of the item *intends* that the item be used for an unlawful purpose, or that the seller or possessor at least *knows* that the item will be used for an unlawful purpose. But at this point, we would be engaged in a re-drafting of Paragraph A of the ordinance that would exceed our proper judicial role.

Moreover, as explained in the next section of our opinion, Paragraph B of the definition of "drug paraphernalia" suffers from a discrete constitutional difficulty.

*The definition of "drug paraphernalia"— Paragraph B: the "reasonable indication of intent" test*

Paragraph B of the ordinance contains an alternative definition of "drug parapherna-

---

10. *Hoffman Estates*, 455 U.S. at 500, 102 S.Ct. at 1194.

11. *Id.*, 455 U.S. at 501, 102 S.Ct. at 1195.

12. *Id.*, 455 U.S. at 502, 102 S.Ct. at 1195.

13. *Id.*

14. *Id.*, 455 U.S. at 503, 102 S.Ct. at 1196.

15. *Id.*

16. *Id.*, 455 U.S. at 503–04, 102 S.Ct. at 1196.

lia". Paragraphs A and B are worded in the disjunctive; that is, even if an item does not qualify as drug paraphernalia under Paragraph A's "objective characteristics" test, that item may still qualify as drug paraphernalia under Paragraph B's "reasonable indication of intent" test.

Paragraph B declares that, in addition to the items covered by Paragraph A, "drug paraphernalia" also means:

any item where circumstances reasonably indicate that the subjective intent of [its] possessor is to use it or sell it for the consumption, ingestion, inhalation, injection or other method of introduction of a controlled substance into the human body or to facilitate a violation of AS 11.71.

The definition codified in Paragraph B suffers from the same underlying problem as the definition codified in Paragraph A: the definition covers both lawful and unlawful uses of controlled substances. As explained above, this problem could conceivably be cured by striking the words "or to facilitate a" and replacing those words with the single word "in". After this change, Paragraph B would define drug paraphernalia as any item "where circumstances reasonably indicate that the subjective intent of [its] possessor is to use it or sell it for the consumption, ingestion, inhalation, injection or other method of introduction of a controlled substance into the human body in violation of AS 11.71."

This curative change would not, however, eliminate all of the constitutional problems in Paragraph B.

It is important to note that Paragraph B does not define "drug paraphernalia" in terms of the possessor's actual subjective intent. Paragraph B does not require proof that the possessor of the item subjectively intended to use or sell the item to accomplish or further the unlawful introduction of a controlled substance into the human body. Rather, under Paragraph B, the government must prove merely that the circumstances *reasonably indicate* that the possessor intended that the item be put to this unlawful purpose.

In other words, Paragraph B allows a defendant to be convicted of the sale or possession of drug paraphernalia when, given the circumstances, a reasonable person would believe, or think it likely, that the defendant intended to use or sell the item to accomplish or further the unlawful introduction of a controlled substance into the human body—regardless of whether the defendant actually intended this.

The constitutional dangers inherent in this formulation of the offense are exacerbated by the provisions of the numbered list that follows Paragraph B.

Paragraph B is followed by a list of fourteen "[c]ircumstances to be considered in assessing the subjective intent" of the possessor of the object. These circumstances include many things that the possessor of the item may not know about or may not understand.

For example, the list of circumstances that the trier of fact may consider includes "[s]tatements [made] by the manufacturer [of the item]" (Item B.1). The list also includes "[n]ational and local advertising concerning [the item's] use" (Item B.9).

The list of circumstances further includes "[d]irect or circumstantial evidence of [the possessor's] intent ... to deliver [the item] to persons who [the possessor] ... *should reasonably [know]* intend to use the object to facilitate a violation of [the state drug laws]" (Item B.6) (emphasis added). In other words, the trier of fact is directed to consider the defendant's *negligence* concerning the ultimate purchaser's purpose for buying the object, as opposed to the defendant's actual awareness of the purchaser's purpose.

Finally, the list of circumstances includes "[e]xpert testimony concerning [the item's] use" (Item B.14). As the defendant points out in his brief to this Court, this provision allows the Municipality to offer the testimony of drug enforcement officers that a particular object is frequently used in connection with the illegal ingestion of controlled substances. As explained above, the ordinance does not require the trier of fact to determine whether the defendant was actually aware of the item's use within the drug culture, or that the defendant actually intended that the item be used in that fashion. Rather, the ordi-

nance declares that the trier of fact need only determine whether the circumstances *reasonably indicate* that the defendant intended to put the object to this use—and that, in assessing the circumstances, the trier of fact can consider expert testimony about the use of the item by drug users, regardless of whether the defendant was personally aware that other people were putting the item to that illegal use.

The underlying problem with the definition of "drug paraphernalia" codified in Paragraph B is that it allows a person to be convicted based on appearances rather than actual criminal intent. Paragraph B requires the Municipality to prove only that the circumstances "reasonably indicate" that the seller or possessor of the item intended for the item to be used in connection with a violation of the drug laws. We emphasize that, under the ordinance as written, this "reasonable indication" is not being used as circumstantial evidence of the defendant's true intention. Rather, "reasonable indication" is all that must be proved.

 Under Alaska law, the guarantee of due process demands that, before a person is subjected to criminal penalties, the government must show that the person acted with some awareness of wrongdoing.[17] This demand would presumably be met if the drug paraphernalia ordinance were written so as to require proof that the seller or possessor of an item actually intended that the item be used for unlawful purposes. But the challenged ordinance is not written that way. Instead, the ordinance requires the Municipality to prove only that the circumstances "reasonably indicate" that the seller or possessor intended the item to be put to an illegal use.

It may be that the drafters of the ordinance really intended to dispense with any inquiry into the defendant's actual intent, and to punish defendants based solely on appearances. Alternatively, the drafters of the ordinance may have intended to punish defendants for their actual intent, but substituted "reasonable indication" for proof beyond a reasonable doubt. In either event,

the "reasonably indicate" language of Paragraph B violates the due process clause.

*The district court's construction of the ordinances*

When the defendant in this case presented his constitutional attacks on the Anchorage drug paraphernalia ordinances, District Court Judge Bryan K. Clark adopted a narrow construction of the ordinances in an effort to answer these constitutional attacks.

With respect to Paragraph A—the "objective characteristics" test for drug paraphernalia—Judge Clark ruled that even if the ordinance's reference to an item's "objective characteristics" was not clear enough, standing alone, to clarify the scope of the prohibition codified in Paragraph A, the list of the twelve categories of items that follows Paragraph A "provides rather detailed guidance as to what an officer should be looking for, and [does] not permit unbridled discretion" in seizing property and charging the possessors of that property.

For the reasons explained above, we respectfully disagree with that conclusion. The twelve categories of items that are listed after Paragraph A are so broadly worded as to potentially criminalize every homemaker, gardener, and hobbyist in Anchorage.

With respect to Paragraph B—the "reasonable indication of intent" test for drug paraphernalia—Judge Clark ruled that this Paragraph's definition of "drug paraphernalia" required proof that the seller or possessor of the item *subjectively intended* that the item be used for the unlawful introduction of controlled substances into a human body. This interpretation of Paragraph B would indeed solve some of the constitutional problems discussed here. But that is not what Paragraph B says.

*Our conclusion*

The current Anchorage ordinances that define and punish the sale and possession of "drug paraphernalia" are flawed by constitutional problems. Paragraph A of the defini-

---

**17.** *See Hentzner v. State,* 613 P.2d 821 (Alaska 1980); *Kimoktoak v. State,* 584 P.2d 25 (Alaska 1978); *Alex v. State,* 484 P.2d 677 (Alaska 1971); *Speidel v. State,* 460 P.2d 77 (Alaska 1969).

tion is unlawfully vague, while Paragraph B of the definition allows a person to be convicted without proof of *mens rea*, or on a standard of proof less than beyond a reasonable doubt.

Theoretically, it would be possible for this Court to re-write the definition of "drug paraphernalia" to answer these concerns. But the re-write would be drastic—so drastic that we believe it falls outside a court's proper sphere of action. For this reason, we conclude that we should not attempt to "construe" these ordinances to eliminate their constitutional flaws. Rather, we simply declare that the ordinances, as written, are unconstitutional.

The judgement of the district court is REVERSED.

STEWART, Judge, dissenting.

Relying primarily on a reason that has never been litigated by the parties, or addressed by the trial court, the Court today holds that the Municipality's drug paraphernalia ordinances are unconstitutional because they are vague.

But a properly enacted law is presumed to be constitutional, and courts should "construe enactments to avoid a finding of unconstitutionality to the extent possible."[1] In addition, the party claiming that an enactment is unconstitutional has the burden of rebutting the presumption of constitutionality.[2] In this case, Myers owned a "head shop" and was charged with and convicted of knowingly possessing drug paraphernalia with the intent to sell it.

In his pre-trial motions, Myers argued that the challenged ordinances' definitions of "drug paraphernalia" did not provide him with adequate notice of the prohibited conduct. But our supreme court has recognized that the possibility of difficult or borderline cases will not invalidate an enactment "where there is a hard core of cases to which the ordinary person would doubtlessly know the statute unquestionably applies."[3]

I conclude that Myers's conduct as the owner of a "head shop" does not present a "borderline" case. To the contrary, his conduct fell within the "hard core of cases." The factual record supports the conclusion that items in Myers's inventory had the objective characteristics or design that indicated that the items were intended to facilitate a violation of a statute under AS 11.71 (controlled substances).

Myers also argued that the ordinances have the potential for arbitrary enforcement. But an appellate court will not invalidate an enactment on this ground unless "there is some history of arbitrary or selective enforcement."[4] As Judge Clark found, Myers made no such showing.

I would not find the ordinances unconstitutional based on reasons not raised or argued by the appellant, nor briefed in any meaningful way. Based on Judge Clark's narrow interpretation and application of the ordinances in this case, and in light of Myers's conduct, I would affirm Myers's convictions.

Accordingly, I dissent from the Court's holding.

---

1. *Treacy v. Anchorage,* 91 P.3d 252, 260 (Alaska 2004); *see also State v. Morgan,* 111 P.3d 360, 361 (Alaska App.2005).

2. *See Nason v. State,* 102 P.3d 962, 964 (Alaska App.2004).

3. *Stock v. State,* 526 P.2d 3, 9 (Alaska 1974); *see also Turney v. State,* 936 P.2d 533, 544 (Alaska 1997).

4. *Holton v. State,* 602 P.2d 1228, 1237 (Alaska 1979).